IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

PATRICK S.,

                Plaintiff,

      vs.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

            Defendant.

8:22-CV-94

MEMORANDUM AND ORDER

This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff Patrick S.'s disability insurance benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq.* and § 1381 *et seq.* The Court has considered the parties' filings and the administrative record, and affirms the Commissioner's decision to deny benefits.

## I. PROCEDURAL HISTORY

On July 3, 2019, the plaintiff filed a Title II application for supplemental security income and disability insurance benefits alleging disability beginning June 1, 2019. Filing 8-2 at 11. His claim was denied initially in November 2019. Filing 8-2 at 11. The plaintiff alleged his back pain worsened in December 2019, so he provided additional medical records and requested reconsideration in January 2020; this claim was also denied. Filing 8-2 at 11. The plaintiff requested a hearing before an administrative law judge (ALJ), which occurred on October 26, 2020. Filing 8-2 at 11. Following that hearing, the ALJ found the plaintiff was not disabled as defined by 20 C.F.R. § 404.1520(f) and therefore not entitled to benefits under the Social Security Act. Filing 8-2 at

22. The Appeals Council of the Social Security Administration denied the plaintiff's request for review of the ALJ's decision. Filing 8-2 at 2. Accordingly, the plaintiff's complaint seeks review of the ALJ's decision as the final decision of the Commissioner under 42 U.S.C. § 405(g). Filing 1.

## II. FACTUAL BACKGROUND

The plaintiff's disability claim is premised on several chronic physical and mental conditions, including sinusitis, pulmonary nodules, anxiety, post-traumatic stress disorder, depression, and alleged chronic fatigue syndrome.

### 1. MEDICAL AND WORK HISTORY

The plaintiff is a resident of Lincoln, Nebraska, and he was born in 1980. Filing 8-6 at 4. He is married and has an adult son who no longer lives with him. Filing 8-6 at 4-5. He most recently worked in a group home, first as a kitchen worker and then a certified peer support specialist. Filing 8-7 at 3, 5. In September 2018, he was working full time, but he gradually reduced his hours starting on June 1, 2019, as his alleged disability worsened. Filing 8-7 at 5-6; filing 8-2 at 41. And by August 2019, he had fully stopped working. Filing 8-7 at 16. The plaintiff previously worked as a fundraising telemarketer from 2009 to 2012; a pizza delivery driver from 2013 to 2016; and a supervisor at a homeless shelter from 2014 to 2016. Filing 8-2 at 41; filing 8-7 at 16. And from 2001 to 2018, he was self-employed doing e-waste recycling. Filing 8-2 at 42; filing 8-7 at 16. The alleged onset date of his disability was June 1, 2019, which was his last day of substantial gainful activity. Filing 8-2 at 14.

The plaintiff experienced childhood trauma and abuse and has dealt with anxiety and post-traumatic stress disorder (PTSD) since childhood. Filing 8-16 at 41. He has a family history of addiction to opioids, including his mother and two siblings. Filing 8-10 at 3; filing 9-4 at 3. The plaintiff has been using a

BiPap machine to treat sleep apnea for several years, and the medical records indicate he had regular check-ins with Nebraska Pulmonary Services related to his sleep apnea and BiPap use. See filing 8-10 at 10. Throughout the medical record, the plaintiff regularly saw a chiropractor to manage back and neck pain. *See* filing 8-10. The record further shows that the plaintiff has dealt with carpal tunnel syndrome since at least March 12, 2018, when he received surgery. Filing 8-10 at 10.

The plaintiff has been obese since early adulthood. Filing 8-16 at 51. According to the plaintiff, starting in June or July of 2018, he had noticed he was not able to lose weight as easily. Filing 8-16 at 51. He also began experiencing fatigue and worsening pain in his back, neck, and knees. *See* filing 8-14 at 2. In July 2018, the plaintiff saw a nurse practitioner at Bluestem Health, Michele Overhalser, APRN, to seek treatment for anxiety and depression. The plaintiff reported he was having difficulty "functioning" because of fatigue, and anxious and fearful thoughts. Filing 8-15 at 41. Ms. Overhalser noted the plaintiff's severe obesity and associated symptoms of anxiety, depression, and fatigue. Filing 8-15 at 41. She also noted that the plaintiff was losing weight. Filing 8-15 at 41. The record shows that the plaintiff's weight fluctuated significantly through the relevant period, from as low as 325.01 pounds on October 23, 2018 (filing 9-6 at 17) to as high as 474 pounds on October 30, 2019 (filing 9-10 at 45).

At the end of July 2018, the plaintiff sought counseling from Marissa Heuer, MSN, APRN, because he "woke up one day feeling physical pain, depression, anxiety, [and] amotivation." Filing 8-16 at 41. He had been attending weekly therapy since May 2018, though by late 2018 his appointments became less frequent, due to a combination of his insurance not covering his appointment and his feeling that the appointments were not

helping. *See* filing 8-16 at 8, 29. Ms. Heuer noted the plaintiff was taking Xanax and Effexor XR for his mental issues, and phentermine to help with weight loss. Ms. Heuer discontinued the Effexor and prescribed Pristiq. She noted the plaintiff responded well to the Pristiq, though his insurance would not pay for it, so she switched his prescription to a higher dose of Cymbalta. She also added Vyvanse, and she told the plaintiff not to take the phentermine while taking Vyvanse. Filing 8-16 at 40.

In August 2018, Ms. Overhalser tested the plaintiff for diabetes, lipoid disorders, endocrine disorders, and other blood diseases to find the cause of the plaintiff's sudden onset of fatigue. Filing 8-15 at 33-34. Without answers to his fatigue, the plaintiff's anxiety and depression worsened, and he continued to see Ms. Heuer regularly. *See generally* filing 8-16, filing 9-4. He continued to take Cymbalta and Xanax, which helped his mood slightly, but he reported having issues motivating himself to go to work. He also consistently reported struggling with fatigue and depression. *See* filing 8-13. The testing came back with normal results, so the plaintiff had no objective medical explanation for his fatigue. *See* filing 8-14 at 45, filing 8-16 at 38. Ms. Overhalser continued to advise the plaintiff to lose weight because his fatigue, depression, and pain were related to his morbid obesity. *See, e.g.,* filing 8-15 at 34.

The plaintiff briefly attended Bellevue University in 2018. He attempted to receive accommodations for his ongoing mental and physical health issues, but he reported to Ms. Heuer that he had problems obtaining these accommodations. Filing 8-16 at 35. Ultimately, the plaintiff medically withdrew from his classes in December 2018, and he was unable to complete his degree. Filing 8-16 at 31.

The plaintiff suffered from an upper respiratory infection in early 2019 that lasted for several weeks. He first sought medical attention on January 30,

2019, and he was advised to take over-the-counter medication. Filing 8-15 at 16. His symptoms persisted well into February. He sought emergency medical attention on February 6, 2019 (filing 8-11 at 25), and February 22, 2019 (filing 8-11 at 7), where he was treated with Levaquin. He returned to Ms. Overhalser on February 25 and received more Levaquin. Filing 8-15 at 7. The plaintiff was also provided with a Ventolin inhaler and instructed to use a nebulizer. Filing 8-15 at 7.

In March 2019, Ms. Overhalser noted the plaintiff was losing weight, and she advised that he limit his television time, change his diet, and exercise more. Filing 8-14 at 47. The plaintiff resumed going to monthly appointments with his chiropractor and his mental health care provider, Ms. Heuer, in April 2019. Filing 8-16 at 25; filing 8-10 at 48. Ms. Heuer prescribed Adderall and discontinued his prescription to Vyvanse to help him with his anxieties at work. After each session, Ms. Heuer described the plaintiff's mood as "[d]ysthmic, improving, pleasant, mildly anxious." *See, e.g.,* filing 8-16 at 7, 11, 15, and 27.

The plaintiff got married in April 2019, and he and his new wife honeymooned in Colorado. *See* filing 8-16 at 21. After the wedding and his honeymoon, the plaintiff reported to Ms. Heuer, on May 8, 2019, that his mood had declined. Filing 8-16 at 21. He had difficulty staying motivated and going to work, and was using Xanax twice per day, telling Ms. Heuer, "I can just tell I need an afternoon dose." Filing 8-16 at 21. The plaintiff stated he felt irritable, fatigued, and depressed. Filing 8-16 at 21.

After the plaintiff's numerous blood tests, lab reports, and doctors' appointments, on May 28, 2019, Ms. Overhalser diagnosed the plaintiff with chronic fatigue syndrome. Filing 8-14 at 38. Ms. Overhalser noted that the plaintiff reported his fatigue had worsened, but his testing continued to come

back normal, including a normal sleep study and normal laboratory reports. Filing 8-14 at 28. The plaintiff was frequently ill with sore throats, coughs, and headaches throughout 2018 and 2019. Filing 8-14 at 28. He also suffered from joint pain. Filing 8-14 at 28. The Adderall prescribed by Ms. Heuer "helps some," but the plaintiff still was struggling with his motivation and getting to work. Filing 8-14 at 28. Ms. Overhalser attributed all these problems to chronic fatigue syndrome. Filing 8-14 at 28. Ms. Overhalser provided the plaintiff with a letter for his employer at the group home explaining that the new diagnosis of chronic fatigue syndrome impaired his ability to work, and his employer would need to adjust his schedule to accommodate him. Filing 9-13 at 34. She did not provide how, specifically, his employer should accommodate him.

The records indicate that the plaintiff reported worsening fatigue after his chronic fatigue syndrome diagnosis. He visited his chiropractor on June 3, 2019, and said that he was "feeling very fatigued after his trip to Colorado to do some hiking." Filing 8-10 at 54. He saw Ms. Heuer on June 5, 2019, reporting little relief from his ongoing anxiety and depression. He told her he had significantly reduced how much he was working, and would go into work when he was feeling up to it. Filing 8-16 at 17.

On June 18, 2019, the plaintiff returned to see Ms. Overhalser to address his fatigue. Ms. Overhalser provided the plaintiff with a letter restricting his work to 12-14 hours per week with one rest day per week, a lifting restriction of 10 pounds, and no prolonged sitting or standing. She also stated that the plaintiff "may need to take breaks during work to hydrate himself or to just rest." Filing 9-13 at 33. Because of his worsening symptoms, Ms. Overhalser considered Cushing's disease, pseudo-Cushing's disease, and Addison's disease; and she tested the plaintiff's cortisol levels. Filing 9-1 at 39.

The plaintiff again experienced a cough and cold symptoms in July 2019, which Nicole Wilford, APRN diagnosed as acute sinusitis. Filing 8-14 at 20. On July 21, 2019, the plaintiff visited the emergency room seeking relief for his fatigue and back pain. He was prescribed Meloxicam and given morphine. A CT scan revealed a left pulmonary nodule, and another small nodule in the left lower lobe. Filing 8-11 at 55; filing 8-12 at 20.

The plaintiff visited Ms. Overhalser on July 30, 2019, and was "very distressed" because he thought he had cancer. Filing 9-1 at 21. Ms. Overhalser, responding to the plaintiff's reported worsening symptoms, further limited his work and wrote a letter stating so on July 30, 2019. She reduced the lifting restriction from ten pounds to five pounds and further restricted the plaintiff to working three days a week with 8-10 hours maximum. The letter also stated that the plaintiff could not sit or stand for longer than 10 minutes at a time. Filing 8-10 at 18. On August 6, 2019, the plaintiff stopped working and was on temporary leave due to his medical appointments until September 1, 2019; he did not return to work. *See* filing 8-7 at 5; filing 8-2 at 14; filing 8-3 at 12.

On August 9, 2019, Ms. Overhalser ordered more diagnostic evaluations for the plaintiff. The lab results showed a solitary pulmonary nodule, primary adrenocortical insufficiency, and another nonspecific abnormal finding of the lung field. Filing 9-1 at 21; filing 8-12 at 15. A few days later, on August 15, 2019, the plaintiff saw Dr. Mohsen Zena for a physical evaluation regarding any adrenal insufficiency. Dr. Zena did not suspect Addison's disease, and further did not expect any adrenal insufficiency because the plaintiff's cortisol levels were normal. Filing 8-13 at 2, 5-6.

On August 30, 2019, the plaintiff went to St. Elizabeth Regional Medical Center for an adrenocorticotropic hormone stimulation test to check his cortisol levels and further investigate any adrenal problems. Filing 9-9 at 18. The lab

7

results showed the cortisol levels "were very good," and Addison's disease was ruled out. Further tests were needed to rule out excess cortisol or Cushing's disease. Filing 9-9 at 17-18.

On August 28, 2019, the plaintiff had a follow up visit regarding his chronic fatigue and chronic pain. He was able to refill his prescription for oxycodone, but was told that use of these opioids was "short term only and he may need to go to pain management." Filing 8-14 at 2. After several trips to the emergency room and to his primary care provider, the plaintiff was told his doctors could no longer prescribe opioids because his pain was chronic, and opioids were better for short-term pain and not the long-term and consistent pain the plaintiff suffered from in his knees and back. Filing 9-6 at 26; filing 9-9 at 28. After this, beginning October 23, 2019, the plaintiff began going to aquatherapy at Bryan Health. Filing 9-3 at 31. The plaintiff said he thought therapy was helping, and his pain levels fluctuated. He continued to have high pain days, and on those days, he was given an easier regimen at aquatherapy. *See* filing 9-3 at 40-45.

On December 2, 2019, the plaintiff began seeing psychologist Thomas Tiegs, Ph.D., at Fallbrook Behavioral Health, and he told the doctor he was struggling with his PTSD, anxiety, and depression. Filing 9-3 at 68. Dr. Tiegs diagnosed the plaintiff with PTSD and major depressive disorder. Filing 9-3 at 68. On December 19, 2020, the plaintiff reported suicidal thoughts to Ms. Heuer, motivated by his "health stuff," and how he "still ha[d] no answers and all these appointments." Filing 9-4 at 10. He also reported feeling financial stress because he had not been working. Filing 9-4 at 10. Ms. Heuer continued to describe the plaintiff's mood as "[d]ysthmic, improving, pleasant, mildly anxious," as she had in previous appointments. Filing 9-4 at 12.

On December 12, 2019, the plaintiff saw a neurologist, Dr. James Bobenhouse, at the request of Ms. Overhalser. Filing 9-3 at 17. The plaintiff complained of chronic neck and shoulder pain and mentioned that seeing a chiropractor was not improving his pain. Dr. Bobenhouse performed a physical evaluation and did not note any abnormalities except for the plaintiff's long-time diagnosis of carpal tunnel syndrome, but he ordered a cervical spine MRI. Filing 9-3 at 18-21. The MRI revealed few abnormalities: the records note minimal disc disease and "tiny disc protrusions," and "small asymmetric uncovertebral osteophytes within the upper cervical spine on the right resulting in mild right neural foraminal stenosis at C2-3 and C3-4." Filing 9-3 at 23.

Later in December 2019, the plaintiff took a break from his regular aquatherapy, counseling, and chiropractor appointments to travel to Colorado to see some friends. *See* filing 9-3 at 54. On January 27, 2020, the plaintiff was prescribed a cane to use daily to help manage his knee and back pain. *See* filing 9-1 at 7; filing 9-3 at 63. The plaintiff saw Dr. Tiegs again on January 3, 2020, and January 31, 2020, and stated he "feels down about having to use a cane." Filing 9-3 at 63. On March 13, 2020, the plaintiff had another MRI arranged by Dr. Bobenhouse to examine his brain. The MRI revealed minimal ethmoid sinus disease, but was normal otherwise. Filing 9-5 at 10.

On May 26, 2020, the plaintiff went to the emergency room to treat ear pain and sinus problems. He was diagnosed with acute sinusitis. Filing 9-12 at 3. In August 2020, the plaintiff went to an ear, nose, and throat doctor for additional treatment for his sinus issues. Dr. Benton Nelson, after evaluating the plaintiff and reviewing his MRI from a prior examination, diagnosed the plaintiff with chronic sinusitis. Filing 9-12 at 41.

### 2. STATE AGENCY EXAMINATION

After filing for disability, the plaintiff's medical history was examined by the state agency. At the initial level, on November 14, 2019, the plaintiff was found to be not disabled. Filing 8-3 at 13. The plaintiff requested a reconsideration in January 2020, alleging his back pain worsened in December 2019 (evidenced by his appointment and MRI with Dr. Bobenhouse), and the plaintiff was again evaluated and found to be not disabled on May 21, 2020. Filing 8-3 at 31.

Patricia Newman, Ph.D., evaluated the plaintiff's disability application on reconsideration. Dr. Newman assessed the plaintiff's mental residual functional capacity and determined that, while the plaintiff had no marked limitations in any category, there were two categories where the plaintiff had moderate limitations: the "ability to carry out detailed instructions," and the "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." Filing 8-3 at 29-30. Dr. Newman based her assessment on neurology exams and the plaintiff's reports to an APRN that he is a "fast learner," and that he feels "down and agitated," but that medications help with his mood. Filing 8-3 at 29.

### 3. ADMINISTRATIVE HEARING

After the state agency twice denied the plaintiff's claim for disability, the plaintiff requested a hearing before an ALJ. The hearing was held on October 26, 2020, with the plaintiff, his attorney, and a vocational expert, Deb Determan. Filing 8-2 at 36. The ALJ noted that the plaintiff submitted medical records the morning of the hearing, and the plaintiff's attorney stated that additional records from Ms. Heuer were forthcoming. Filing 8-2 at 39-40.

The ALJ asked the plaintiff about his work as a fundraising telemarketer and asked if the job was like outgoing telemarketing. The plaintiff answered, "Yeah, outgoing and in-going. Mostly outgoing though, yes." Filing 8-2 at 41. The plaintiff described that his job was "basically a[n] office, kind of clerical, sitting in a cubicle all day, typing and making phone calls to supporters of various campaigns, things of that nature." Filing 8-2 at 41. Later in the hearing, the vocational expert, after listening to the plaintiff's description of the work he performed, classified that work as "telemarketing," Dictionary of Occupational Titles ("DOT") code 299.357-014. Filing 8-2 at 60. The ALJ presented the expert with the following hypothetical:

> [A] hypothetical person the claimant's same age, education, and past work experience. Assume further the ability to work at the sedentary level, frequent as opposed to constant handling and fingering bilaterally, occasionally climb ramps and stairs, never climb ladders, robes, or scaffolds, occasionally balance, stoop, kneel, crouch, crawl, should avoid work around hazards such as unprotected heights and moving mechanical parts, can tolerate occasional exposure to high humidity, pulmonary irritants, extreme hot or cold temperature… [and] the individual would be precluded from complex tasks, but could do detailed work that could be learned within six months.

Filing 8-2 at 60-61. The vocational expert testified that the hypothetical person would be able to perform the telemarketing job as previously performed by the plaintiff. Filing 8-2 at 61. The ALJ asked if a hypothetical person with the above characteristics but with the additional limitation of needing to alternate between sitting and standing every thirty minutes would be able to perform

the telemarketing job. The expert answered that the person could perform the job, "but the number of positions available would be diminished." Filing 8-2 at 61. The expert estimated that "50% of the jobs would allow for this type of sitting and standing." Filing 8-2 at 62. The ALJ asked about a longer period of sitting, roughly 60 minutes, before a 2- to 3-minute standing break, and the vocational expert testified that "probably at least 75%" of jobs would allow for this. Filing 8-2 at 62.

#### 4. SEQUENTIAL ANALYSIS AND ALJ FINDINGS

##### (a) Steps One and Two

On December 1, 2020, the ALJ issued an unfavorable decision, finding that the plaintiff was not disabled. Filing 8-2 at 8. To determine whether a claimant qualifies for disability benefits, an ALJ performs a five-step sequential analysis of the claim. 20 C.F.R. § 404.1520(a)(4). At the first step, the claimant has the burden to establish that he has not engaged in substantial gainful activity since his alleged disability onset date. *Gonzales v. Barnhart,* 465 F.3d 890, 894 (8th Cir. 2006); 20 C.F.R. § 404.1520(a)(4)(i). Regarding step one, the ALJ found that the plaintiff met the insured status requirement of the Social Security Act through December 31, 2024, and that the plaintiff had not engaged in substantial gainful activity since June 1, 2019, the plaintiff's alleged onset date. Filing 8-2 at 14.

At step two, the medical severity of the claimant's impairment is considered. 20 C.F.R. § 404.1520(a)(4)(ii). The claimant has the burden to prove a medically determinable physical or mental impairment or combination of impairments that significantly limits his physical or mental ability to perform basic work activity. *Gonzales,* 465 F.3d at 894. The ALJ found the following severe medically determinable impairments: obesity; bilateral carpal tunnel syndrome; degenerative disc disease; and sleep apnea. The ALJ found that the

following medically determinable impairments existed, but were not severe: allergies; sinusitis; pulmonary nodules; anxiety; post-traumatic stress disorder; and depression. The ALJ addressed references to fibromyalgia and chronic fatigue references in the medical record and determined, after considering SSR 12-2p, 77 Fed. Reg. 43,640 (Jul. 25, 2012) and SSR 14-1p, 79 Fed. Reg. 18,752 (Apr. 3, 2014), that the record did not support finding these illnesses as medically determinable impairments. Filing 8-2 at 14-16.

### (b) Step Three

At step three, the medical severity of the claimant's impairments is considered. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairments meet or equal a presumptively disabling impairment listed in the regulations, the analysis ends, and the claimant is automatically found disabled and entitled to benefits. *Gonzales*, 465 F.3d at 894. The ALJ found that the plaintiff's impairments, considered singly or in combination, did not meet or equal any specific listing. Filing 8-2 at 16.

Four "broad functional areas" are used to rate these limitations: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). These areas are also referred to as the "paragraph B criteria," which are contained in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*. The first three criteria are rated using a five-point scale of none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The fourth criterion, episodes of decompensation, is rated as: none, one or two, three, four or more. *Id*. The ALJ concluded that the plaintiff had no limitation regarding his capacity to understand, remember, or apply information; his ability to interact with others; or his capacity to adapt or manage himself; and the ALJ found he had

no more than a mild limitation regarding his ability to concentrate, persist, or maintain pace. Filing 8-2 at 15-16.

### (c) Step Four

At step four, a claimant has the burden to prove the lack of a residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv); *Gonzales*, 465 F.3d at 894. The ALJ found that the plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), and found the plaintiff "can frequently perform handling and fingering bilaterally; never climb ladders, ropes or scaffolds; occasionally climb stairs or ramps; occasionally balance, stoop, kneel, crouch and crawl; can tolerate occasional exposure to high humidity, extreme hot/cold temperatures, and pulmonary irritants; and should never work around hazards." Filing 8-2 at 17-18. Further, the ALJ found the plaintiff "would require the opportunity to alternate between sitting and standing, such that after sitting for approximately 60 minutes, he would need to be able to stand up for approximately 2-to-3 minutes, during which time he could remain on task and at the workstation." Filing 8-2 at 17-18. The referenced regulation defines sedentary work as work that involves sitting, but "a certain amount of walking and standing is often necessary." 20 C.F.R. § 404.1567(a).

In assessing the plaintiff's capacity to perform past relevant work, the ALJ followed a two-step process to first determine whether any underlying medical condition, physical or mental, could cause the plaintiff's pain or symptoms, and second, evaluate the extent to which the underlying condition limits the plaintiff's work-related activities. The ALJ considered the intensity, persistence, and other limiting factors of the underlying condition. The ALJ determined that the plaintiff's physical and mental impairments may cause some of his symptoms, but that the plaintiff's statements regarding the

14

intensity, frequency, and limiting effects of these symptoms "are not entirely consistent with the medical evidence and other evidence in the record." Filing 8-2 at 18. The ALJ specifically pointed to a cervical spine imaging study from December 2019 that showed only mild disc abnormalities which would cause the plaintiff's pain, and referenced other imaging and diagnostic study findings. The plaintiff's physical exams did not support his "vague subjective complaints" about pain, cramps, or tenderness. Filing 8-2 at 19.

The ALJ reviewed the record and pointed to inconsistencies in the plaintiff's reported symptoms. The plaintiff stated that changing positions from sitting to standing both alleviated and aggravated his symptoms. He "consistently reported that prolonged sitting and standing were aggravating factors," but the record showed that the plaintiff made several trips to Colorado, driving up to fifty miles and doing some hiking. The ALJ considered the plaintiff's statements to his chiropractor and other care providers that his range of motion had increased and his treatment was effective throughout 2019. Filing 8-2 at 20.

The ALJ also considered the type, dosage, effectiveness, and side effects of the plaintiff's pain medication and treatments. Filing 8-2 at 20. The ALJ noted that the plaintiff's "use and pursuit of strong narcotic pain medications gives some indication of the intensity, persistence, and limiting effects of the claimant's symptoms," and stated that this pain was reflected in the RFC. Filing 8-2 at 20. The ALJ noted that overall, the plaintiff's "medication regimen appears otherwise stable and reportedly effective." Filing 8-2 at 20.

The ALJ also evaluated the medical and non-medical opinions provided by the plaintiff as required under 20 C.F.R. § 404.1529. The ALJ determined that the non-examining state agency psychological and medical consultants at the reconsideration levels had "persuasive" opinions. The ALJ explained that

the state agency opinions "provided adequate explanation for their opinions, with discussion of relevant evidence in the written record to support their limitations or support their lack of certain limitations." Filing 8-2 at 21. Further, the ALJ remarked that these opinions were consistent with the record "available at the time of their respective reviews," and while additional evidence was available at and after the hearing, this additional evidence did not support greater limitations than those opined by the state agency. Filing 8-2 at 21.

The ALJ stated that the opinions of Michele Overhalser and Marissa Heuer were not persuasive. Filing 8-2 at 21. Ms. Overhalser's opinions "were issued at the claimant's request," and the ALJ determined there was "no objective evidence" that supported Ms. Overhalser's work limitations. Filing 8-2 at 21. Further, the ALJ determined Ms. Overhalser's opinion was not supported by "a review of the claimant's longitudinal treatment history." Filing 8-2 at 21. As for Ms. Heuer's opinions, the ALJ determined she "had no reasonable basis to opine" on the "significant and extreme limitations" she prescribed for the plaintiff because her treatment notes "do not reflect the severity of symptoms or extent of limitations she endorses." Filing 8-2 at 21. The ALJ's description of the weight he gave Ms. Heuer's opinion does not address whether Ms. Heuer's opinion was consistent with the rest of the medical history. Filing 8-2 at 21.

The ALJ further considered statements by the plaintiff's wife. The ALJ determined that the plaintiff's wife is not medically trained, and she is not a "disinterested third party witness," and so the ALJ determined that her opinions were unpersuasive. Filing 8-2 at 22.

After considering all the medical opinions and crafting the plaintiff's RFC, the ALJ determined at step four that the plaintiff was able to perform

his past relevant work as a telemarketer. The ALJ relied on the vocational expert's classification of the plaintiff's past work as telemarketer, DOT 299.357-014, the plaintiff's own description of the job as he performed it, and the expert's opinion that a hypothetical individual with the same age, education, work experience, and RFC as the plaintiff would be able to perform this job. Filing 8-2 at 22. Because the ALJ determined the plaintiff could perform past relevant work, the ALJ concluded the plaintiff was not under a disability, and the ALJ denied the plaintiff's claims for benefits. Filing 8-2 at 23.

## III. STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner for errors of law and to determine whether the denial is supported by substantial evidence on the record as a whole. *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id*. The Court considers the entire administrative record—the evidence that detracts from the decision, as well as the evidence that supports it—but the evidence is not reweighed. *See id*. Instead, the Court will disturb the ALJ's decision only if it falls outside the available "zone of choice." *Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021). And the ALJ's decision is not outside the zone of choice simply because this Court might have reached a different conclusion as the initial finder of fact. *Id*. Rather, if the record contains evidence that a reasonable person might accept as adequate to support the ALJ's conclusion, the Court may not reverse—even if it would reach a different conclusion, or merely because there is also evidence that might support a contrary outcome. *See id*.; *Byes*, 687 F.3d at 915.

17

The Court reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011). And the Court defers to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).

## IV. DISCUSSION

The plaintiff generally alleges that the ALJ's finding of not disabled is neither supported by substantial evidence nor consistent with legal and regulatory standards. In particular, the plaintiff argues that the ALJ erred by: (1) finding the plaintiff could perform his past relevant work as generally and actually performed; (2) failing to provide appropriate weight to the plaintiff's treating medical opinions; (3) determining the plaintiff's mental impairments were non-severe; and (4) failing to find the plaintiff's chronic fatigue syndrome is a medically determinable impairment. Further, the plaintiff makes a constitutional argument that this case must be remanded to a new ALJ because the ALJ who issued the finding was not properly appointed. Filing 13 at 3-4.

## 1. PAST RELEVANT WORK

The plaintiff argues that the ALJ's determination that the plaintiff can perform his past relevant work as a telemarketer is not supported by substantial evidence and is contrary to the law. The plaintiff asserts: (a) the vocational expert misclassified the plaintiff's prior occupation under the DOT; (b) the ALJ erroneously and unlawfully assumed that disability accommodations would be available to the plaintiff in his past relevant work;

and (c) the ALJ failed to develop the record regarding the plaintiff's job as actually performed, therefore his determination that the plaintiff's RFC enables him to perform his job is not sufficiently supported.

(a) Misclassification of Fundraising Work

The plaintiff's first argument is that the ALJ directed the vocational expert to the wrong DOT job. The ALJ, relying on the vocational expert and the plaintiff's testimony at the administrative hearing, classified the plaintiff's past work as "telemarketer," DOT 299.357-014. Filing 8-2 at 22. The plaintiff argues that the DOT job listings for "Fund Raiser I," DOT 293.157-010, and "Fund Raiser II," DOT 293.357-014, are more accurate descriptions. The distinction between "telemarketer" and "fundraiser" is important because under the DOT, the telemarketer job is a sedentary exertion level job, while the fund raiser jobs are a light exertion level. Because the plaintiff's RFC limits him to sedentary work, he would not be able to perform his past relevant work if the job were classified as either of the "Fund Raiser" DOT jobs.

The plaintiff has the burden to show that he cannot perform past relevant work, and an obligation to raise an objection to a vocational expert's classification at an administrative hearing. *Sloan v. Saul*, 933 F.3d 946, 950 (8th Cir 2019); *Jones v. Saul*, 834 F. App'x 839 (5th Cir. 2020). An ALJ's determination is supported by substantial evidence if the ALJ relied on a vocational expert's opinion, particularly when the vocational expert has listened to the plaintiff's testimony. *Swedberg v. Saul*, 991 F.3d 902, 905 (8th Cir. 2021).

Neither the plaintiff nor his counsel corrected the ALJ when the ALJ asked the plaintiff if he would consider his prior work "telemarketing." Instead, the plaintiff answered affirmatively and gave a description of the work he performed. Filing 8-2 at 41. And counsel declined the opportunity to question

and cross-examine the vocational expert on this issue. Filing 8-2 at 62. The vocational expert listened to the plaintiff's description of his work before classifying the job. Nothing the plaintiff said at the hearing contradicts the vocational expert's classification, so the vocational expert's testimony was based on sufficient evidence and the ALJ was entitled to rely on the expert's testimony. *Swedberg*, 991 F.3d at 905. This Court's review of the record and the DOT descriptions does not contradict the evidence available to the ALJ at the hearing. Therefore, the ALJ's finding that the plaintiff formerly completed "telemarketing" as described in DOT 299.357-014 is supported by substantial evidence.

### (b) Accommodations

The plaintiff next argues that the ALJ erred by assuming that accommodations would be available to the plaintiff in his past relevant work. Filing 13 at 23-24. The plaintiff cites the Program Operations Manual System (POMS) DI 25005.020 to argue that an ALJ should not assume that disability accommodations would be available in past relevant work unless such accommodations were previously available. Filing 13 at 23-24. The plaintiff asserts that he would need accommodations if he returned to this job; thus, the ALJ's finding that the plaintiff is able to perform past relevant work is not supported by substantial evidence. The Commissioner argues that the ALJ properly relied on the vocational expert's testimony that the plaintiff would be allowed to alternate between sitting and standing, and that at least 75 percent of employers would allow it. Filing 15 at 7-8.

"As an interpretation of a regulation promulgated by the Commissioner, the POMS control unless they are inconsistent with the regulation or plainly erroneous." *Rodysill v. Colvin*, 745 F.3d 947, 950 (8th Cir. 2014). The POMS cited by the plaintiff provides guidance for ALJs in determining whether a

20

claimant can perform past relevant work generally or as actually performed. The POMS states that if a previous employer offered accommodations to a claimant, then the claimant is able to do the past relevant work, even if the accommodations would not be available in other workplaces. However, an ALJ should "not assume disability accommodations would be available" for jobs in the national economy. POMS DI 25005.020.

Here, however, the ALJ did not assume disability accommodations would be available – he relied on vocational expert testimony relating to this accommodation. The ALJ asked the vocational expert if, in the telemarketer job as generally performed, a hypothetical individual could take a 2-to-3-minute break to stand up after 60 minutes of sitting. This accommodation is reflected in the RFC announced by the ALJ. The vocational expert testified that "probably at least 75%" of jobs would allow for this type of accommodation. The Eighth Circuit has affirmed the denial of benefits where a vocational expert testifies that accommodations are commonly provided to individuals in the workplace. *See Higgins v. Comm'r*, 898 F.3d 793, 796 (8th Cir. 2018). Thus, the ALJ's determination that the plaintiff would be able to take standing breaks at his past relevant work is supported by substantial evidence because the ALJ properly relied on the vocational expert's testimony.

### (c) Inconsistencies with RFC

The plaintiff also argues that the ALJ did not sufficiently consider the plaintiff's RFC before finding that the plaintiff would be able to perform his past relevant work. The plaintiff asserts the ALJ did not sufficiently develop the record to determine what duties the plaintiff actually had at his past relevant work as a telemarketer, and thus the ALJ's finding that the plaintiff can perform past relevant work as generally and actually performed is not supported by substantial evidence. Filing 13 at 24-25.

An ALJ is required to make "explicit findings" regarding the physical and mental demands of the plaintiff's past work, and the ALJ must compare those demands with the plaintiff's RFC to determine whether he could perform the job. *Lowe v. Apfel,* 226 F.3d 969, 972 (8th Cir. 2000). Here, the ALJ explicitly compared the plaintiff's RFC with the physical and mental demands of his work, filing 8-2 at 22, relying on the vocational expert's testimony where the ALJ posed a hypothetical with the plaintiff's RFC. A vocational expert's testimony constitutes substantial evidence supporting a finding that a plaintiff can perform past relevant work. *See Miller v. Shalala,* 8 F.3d 611, 613 (8th Cir. 1993). Therefore, the ALJ's finding that the plaintiff could perform his past relevant work with his RFC is supported by substantial evidence.

## 2. WEIGHT AFFORDED TO OPINIONS

The plaintiff asserts the ALJ committed two legal errors which merit remand for further proceedings. First, the plaintiff alleges the ALJ erred under *Gann v. Berryhill,* 864 F.3d 947 (8th Cir. 2021) because the ALJ allegedly failed to account for all of the limitations assessed by Dr. Patricia Newman, an opinion the ALJ gave "persuasive" weight. Filing 13 at 25-27. Second, the plaintiff alleges the ALJ erred under *Bonnett v. Kijakazi,* 859 F. App'x 19 (8th Cir. 2021) because the ALJ did not describe the ways in which Ms. Heuer's opinion was consistent or inconsistent with the medical records as a whole. Filing 13 at 33. The plaintiff also asserts that the ALJ did not provide sufficient reasons for finding Ms. Overhalser's opinion unpersuasive. Filing 13 at 34.

### (a) Dr. Newman

The plaintiff asserts the ALJ committed a legal error when he failed to account for all limitations outlined by Dr. Patricia Newman, the state agency psychological consultant. The plaintiff argues that because the ALJ found Dr.

Newman's opinions "persuasive," the ALJ must account for all the limitations Dr. Newman outlined in her opinion. Dr. Newman reported the plaintiff had mental limitations regarding detailed instructions, and pace and breaks limitations, which the plaintiff argues the ALJ did not address in his determination of the plaintiff's RFC. The plaintiff argues this violates 20 C.F.R. § 404.1520c, as interpreted by *Gann*.

According to the plaintiff, *Gann* mandates that if an ALJ finds a medical opinion "persuasive," the RFC must account for, or explain the absence of, any and all limitations described in the opinion. 864 F.3d at 952-53; filing 13 at 25-27. However, the ALJ did, in fact, account for the mental limitations opined by Dr. Newman in the hypothetical posed to the vocational expert. The ALJ's hypothetical included statement that "the individual would be precluded from complex tasks, but could do detailed work that could be learned within six months." Filing 8-2 at 61. This hypothetical is consistent with Dr. Newman's findings that the plaintiff's ability to understand and remember detailed instructions is "moderately limited," especially considering the plaintiff's own report that he "is a fast learner." Filing 8-3 at 29. Dr. Newman also found the plaintiff's ability to carry out detailed instructions, and his ability to complete a normal workday, are only moderately limited. Thus, the ALJ's hypothetical properly posed all of the plaintiff's limitations and impairments based on the persuasive weight given to Dr. Newman's medical findings. And the hypothetical is consistent with the ALJ's finding that the plaintiff has a mild limitation in concentrating, persisting, or maintaining pace.

The ALJ addressed Dr. Newman's limitations in determining whether the plaintiff could perform his past relevant work as specifically and generally performed by posing these limitations in the hypothetical to the vocational expert. The ALJ's failure to include the mental limitations in the RFC is not

23

reversible error because the ALJ properly relied on the vocational expert's testimony that, even with the mild mental limitations described by the ALJ, the plaintiff is still able to perform past relevant work, warranting a finding of not disabled. *See Vicky R. v. Saul*, No. 19-cv-2530, 2021 WL 536297, at *14-15 (D. Minn. Jan. 28, 2021).

### (b) Ms. Heuer

The plaintiff next argues that the ALJ erred under *Bonnett v. Kijakazi*, an unreported Eighth Circuit case, by failing to sufficiently explain why he found Ms. Heuer's medical opinion to be unpersuasive. In *Bonnett*, the Eighth Circuit remanded a case because the ALJ did not address whether a physician's opinion was consistent with other evidence in the record as required by 20 C.F.R. § 404.1520c. 859 F. App'x at 20. The plaintiff argues the ALJ in this case made the same mistake by stating that Ms. Heuer's opinion was not persuasive, and only describing the ways the opinion is not supported and failing to describe the ways the opinion is not consistent with the rest of the record. Filing 13 at 33.

Per § 404.1520c, an ALJ must consider supportability and consistency, as well as other factors, in evaluating the persuasiveness of a medical opinion. And the ALJ must explain how the supportability and consistency factors are considered. § 404.1520c(b)(2). Consistency refers to how consistent a medical opinion is "with the evidence from other medical sources and nonmedical sources in the claim," not consistency within the medical opinion itself. § 404.1520c(c)(2). An ALJ need not specifically use the words "supportability" or "consistency," but an ALJ must articulate the reasons why an opinion is given a particular weight. *See Buckner*, 646 F.3d at 559.

Here, the ALJ's explanation of the weight he gave Ms. Heuer's opinion reads, in full, as follows:

> Similarly [to Ms. Overhalser's opinion], the undersigned finds that the opinion of the claimant's psychiatric medication management provider is not persuasive (Exhibit 38F). This provider endorsed significant and extreme limitations, many of which she would have no reasonable basis to opine. For instance, she endorsed that the claimant's impairments would cause him to be absent from work more than four days per month. She does not explain this, and her treatment notes do not reflect the severity of symptoms or extent of limitations she endorses.

Filing 8-2 at 21. Although the ALJ failed to explicitly address the supportability or consistency of Ms. Heuer's medical opinions, the ALJ's "arguable deficiency in opinion-writing technique" does not warrant a remand. *Bucker*, 646 F.3d at 559. This Court's thorough review of the record as a whole indicates that the ALJ did not consider Ms. Heuer's opinion to be consistent with the record. Had the ALJ repeated his phrasing in the preceding paragraph regarding Ms. Overhalser's opinion ("nor does a review of the claimant's longitudinal treatment history reveal support for these [work restrictions]" (filing 8-2 at 21)), the ALJ would have been in perfect compliance with § 404.1520c. The omission of this sentence had no bearing on the outcome of the plaintiff's case. The Court will not remand this case for deficient opinion writing when the record as a whole is clear the ALJ did not find Ms. Heuer's opinion to be consistent with the objective medical evidence. *See Bucker*, 646 F.3d at 560.

### (c) Ms. Overhalser

The plaintiff next contends that the ALJ did not provide good reasons for rejecting the treating opinions of Ms. Overhalser. Filing 13 at 34. The ALJ

asserted that Ms. Overhalser had no objective basis to continue placing work restrictions on the plaintiff, and so the work restrictions were not persuasive. The plaintiff argues that Ms. Overhalser's notes reflect that she was limiting the plaintiff's work as a result of his worsening symptoms.

As described above, an ALJ must consider supportability and consistency, as well as other factors, in evaluating the persuasiveness of a medical opinion. § 404.1520c. Here, the ALJ found that Ms. Overhalser's work restrictions were based purely on the plaintiff's subjective complaints and were not supported by objective medical evidence. This meets the supportability prong. And the ALJ found that Ms. Overhalser's restrictions were not supported by "a review of the claimant's longitudinal treatment history," speaking to the consistency factor. Filing 8-2 at 21. Thus, the ALJ provided appropriate support in determining that Ms. Overhalser's opinion was not persuasive. The Court finds the ALJ's determination is supported by substantial evidence.

### 3. MENTAL IMPAIRMENTS AS NON-SEVERE

The plaintiff also alleges that the ALJ's finding that the plaintiff's mental impairments are non-severe was not supported by substantial evidence. This argument is premised on the so-called *Gann* and *Bonnett* issues, addressed above. *See* filing 13 at 28-30. As discussed above, the ALJ's assessment of the medical opinions in the record was supported by substantial evidence, and the ALJ did not commit a legal error. Therefore, the Court finds that the ALJ's assessment of the plaintiff's mental impairments as non-severe is supported by substantial evidence and in compliance with the relevant regulations.

4. Chronic Fatigue Syndrome as a Medically Determinable Impairment

According to the plaintiff, the ALJ's determination that the plaintiff's chronic fatigue syndrome was not a medically determinable impairment was not supported by substantial evidence and is contrary to SSR 14-1p. Filing 13 at 30. SSR 14-1p provides guidance to ALJs regarding when chronic fatigue syndrome constitutes a medically determinable impairment. Under this guidance, to establish a medically determinable impairment of chronic fatigue syndrome, a claimant must show the following: (1) a physician's diagnosis, based on a review of the patient's medical history and a physical examination; (2) that the diagnosis is not inconsistent with the rest of the medical records; and (3) medical signs or laboratory findings that support a diagnosis of chronic fatigue syndrome. SSR 14-1p.

The Commissioner does not contest that the plaintiff was diagnosed with chronic fatigue syndrome. But the lack of objective medical evidence, *i.e.*, medical signs or laboratory findings, was central in the ALJ's determination that the plaintiff's chronic fatigue syndrome was not a medically determinable impairment. Filing 8-2 at 16. The ALJ stated that he considered the guidance in SSR 14-1p in making his determination that the record did not support finding chronic fatigue syndrome as a medically determinable impairment. Filing 8-2 at 16. The guidance acknowledges that there are not laboratory findings that are widely accepted as being associated with chronic fatigue syndrome, but an ALJ must base a finding of chronic fatigue syndrome as a medically determinable impairment on some kind of objective medical evidence. SSR 14-1p lists some medical signs which, if "clinically documented over a period of at least 6 consecutive months," may "help establish the existence of [a medically determinable impairment] of [chronic fatigue syndrome]." Medical signs might include sinusitis or pronounced weight

27

change, which the plaintiff argues are present in the record and support a finding of a medically determinable impairment of chronic fatigue syndrome. Filing 13 at 30-31.

Lab testing repeatedly came back "normal" for the plaintiff, including sleep studies. Filing 8-14 at 38. The ALJ found that the plaintiff suffers from sinusitis as a non-severe medically determinable impairment, but the record does not indicate that his sinusitis was "clinically documented over a period of at least six consecutive months" as required under SSR 14-1p. The plaintiff suffered from respiratory infections, likely a result of sinusitis, in January and February 2019 (*see* filing 8-15 at 16), but then not again until July 2019 (filing 9-12 at 41), and his condition was not labeled "chronic" until August 2020 (filing 9-12 at 41).

Regarding "pronounced weight change," the plaintiff argues that the medical records indicate wide fluctuations in his weight in short windows of time. Filing 13 at 31. Further, the plaintiff argues that his doctors noted his weight gain was related to his fatigue. However, the records indicate that the plaintiff's fatigue was caused by his weight and sedentary lifestyle, not the other way around. *See, e.g.,* filing 8-15 at 34.

Demonstrating sinusitis or pronounced weight gain does not automatically entitle a claimant to a finding that chronic fatigue syndrome is a medically determinable impairment. The ALJ still must weigh the evidence as a whole to determine what impairments a claimant has, and this Court will not reweigh the evidence. *See Byes,* 687 F.3d at 915. Here, Ms. Overhalser's treatment notes the day she diagnosed the plaintiff with chronic fatigue syndrome indicate that the plaintiff's blood tests, lab reports, and sleep studies were all normal. Filing 8-14 at 28. It appears Ms. Overhalser diagnosed chronic fatigue syndrome based on the plaintiff's frequent sore throats, coughs, and

headaches, as well as his joint pain. Filing 8-14 at 28. However, the ALJ noted that the plaintiff was sleeping well with the use of his BiPap; that the plaintiff was able to travel to Colorado; and that the plaintiff did not have issues attending his medical appointments or performing daily activities. Filing 8-2 at 15, 20. These factors weigh against the plaintiff's assertion that his chronic fatigue syndrome makes him unable to work. The ALJ properly weighed the evidence, and the Court finds the ALJ's determination that the plaintiff's chronic fatigue syndrome was not a medically determinable impairment is supported by substantial evidence.

The plaintiff also argues that the ALJ did not provide good reasons for finding that the plaintiff's subjective complaints about his fatigue were not credible. Filing 13 at 34-35. But the ALJ did assess the plaintiff's complaints and determined that the plaintiff's descriptions of his limitations and his complaints of his pain were not consistent with objective medical evidence. Filing 8-2 at 18. For these reasons, the ALJ's determination that the plaintiff's chronic fatigue syndrome is not a medically determinable impairment is supported by substantial evidence.

### 5. FVRA

The plaintiff's final argument is that the ALJ in this case, Matthew Bring, was not constitutionally appointed, necessitating a remand with a new ALJ. The plaintiff raises for the first time on appeal a claim that the ALJ was an inferior officer who, pursuant to *Lucia v. SEC*, 138 S. Ct. 2044 (2018), required appointment by the President, Courts of Law, or a validly acting Commissioner, and that Acting Commissioner Nancy Berryhill's ratification of Mr. Bring's appointment was invalid under the Federal Vacancies Reform Act (FVRA), 5 U.S.C. § 3345 *et. seq.* The Commissioner argues that Commissioner

Berryhill properly was serving with all the power and authority of the office under the FVRA.

Appointments Clause challenges are deemed to be "in the category of non-jurisdictional structural constitutional objections that could be considered on appeal whether or not they were ruled upon below." *Freytag v. C.I.R.*, 501 U.S. 868, 879-80 (1991). It strikes the Court that the doctrines of waiver and forfeiture are inapposite when it is the ALJ's responsibility to develop the record fully and fairly, independent of the plaintiff's burden to press his case. *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017).

The problem the Court finds regarding the plaintiff's Appointments Clause challenge is that this Court reviews the ALJ's decision de novo on the record for legal error. *Id.* at 645-46. But here, there is an absence of a record regarding the plaintiff's Appointments Clause challenge because it was not raised before the ALJ. The regulations provide a process to reopen and supplement an administrative record after a final decision has been issued. 20 C.F.R. § 404.987. A claimant can reopen an ALJ's decision for any reason within twelve months from the date of the initial decision. 20 C.F.R. § 404.988. The ALJ's decision in this matter was issued on December 1, 2020. Filing 8-2 at 8. The plaintiff filed his complaint in this matter on March 11, 2022. Filing 1. Instead of raising the Appointments Clause challenge for the first time on appeal, the plaintiff could have reopened the record and presented his claim at the administrative level. Evidence could have been adduced, and arguments could have been made, and this Court would have been furnished a record to review. Had the Commissioner denied a request to reopen the ALJ's decision, that decision would have been reviewable if deemed to present a colorable constitutional claim. See *Califano v. Sanders*, 430 U.S. 99, 109 (1977); *Mitchell v. Colvin*, 809 F.3d 1050, 1055 (2016).

The plaintiff and the Commissioner have presented this Court with arguments in support of their positions and have referenced documents that are not part of the administrative record. Those documents have not been offered and received into evidence. No court or tribunal has been asked to take judicial notice of the documents, nor have they been authenticated by the offering party or stipulated to by the opposing party. No record has been made regarding Mr. Bring's history and appointment as an ALJ. This Court is unwilling to assume facts and evidence regarding the ALJ and Commissioner's appointment that are not included in a record, and will not return this matter for reconsideration based only on arguments and speculation.

IT IS ORDERED:

1.  The plaintiff's motion for reversal of the Commissioner's final decision (filing 12) is denied.

2.  The Commissioner's motion to affirm the Commissioner's filing decision (filing 14) is granted.

3.  The plaintiff's complaint is dismissed.

4.  A separate judgment will be entered.

Dated this 31st day of October, 2022.

BY THE COURT:

John M. Gerrard
United States District Judge